**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| EDNA FLYGARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:08CV0029 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This action is before this Court[1] for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Edna Flygare was not disabled

and, thus, not entitled to disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-434, or supplemental security income under Title XVI of the Act,

id. §§ 1381-1383f.  For the reasons set forth below, the decision of the Commissioner

shall be affirmed.

Plaintiff, who was born on June 13, 1954, filed for benefits in the summer of 2006,

at the age of 52, alleging a disability onset date of April 1, 2003, due to fibromyalgia and

heart and respiratory problems.  After Plaintiff's application was denied at the initial

administrative level, she requested a hearing before an Administrative Law Judge ("ALJ")

---

[1]    The parties have consented  to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

and such a hearing was held on September 26, 2006. At the hearing, Plaintiff, who was represented by counsel, amended her disability onset date to December 13, 2003. By decision dated October 4, 2006, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform her past relevant work as a department manager, store manager, or store clerk. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 8, 2008. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision was not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ improperly evaluated Plaintiff's credibility, erred in not consulting a vocational expert ("VE"), and erred in finding that Plaintiff could return to her past work. Plaintiff requests that the ALJ's decision be reversed and remanded for an award of benefits from December 13, 2003, or alternatively, that the case be reversed and remanded so that a VE can be consulted.

## BACKGROUND

### Work History and Application Form

The record indicates that Plaintiff's past employment included doing office work in a nuclear plant from 1986 to 1992. She earned $6,000 in 1986 and her income generally increased through 1992, when she earned $36,000.[2] Plaintiff was employed from 1995 to

---

[2] All earnings noted in this paragraph are approximations.

2002 managing a retail store. Her earnings increased from $2,000 in 1995 to $21,000 in 1999. In 2000 she earned $9,000; in 2001 she earned $22,000; and in 2002 she earned $18,000. Plaintiff reported that her most recent employment was from October 2002 to April 2003 as a home healthcare worker earning $8.50 an hour, 40 hours a week. Earnings records show that she earned $2,000 in each of 2003 and 2004. (Tr. 74, 83.)

She described the job of store manager as including unloading trucks, scheduling employees, preparing daily reports, and training cashiers. (Tr. 84.) In a Work History Report dated September 2004, Plaintiff indicated that the job managing the retail store involved working 12 hours per day, six days a week, and required walking, standing, stooping, kneeling, and crouching six hours each day. She lifted 50 pounds or more frequently and at times over 100 pounds. She also reported that she worked as a department manager in a department store six hours a day, but that she did not remember the dates of employment. Each day, this position required lifting of no more than ten pounds; walking two hours; standing four hours; and stooping, kneeling, and crouching for one hour. Plaintiff also noted that she had worked 40 hours a week as a store clerk sometime between August 1997 and February 1998. During each eight-hour day in this position she walked one hour, stood six hours, and stooped and kneeled one half hour each. This job required lifting 20 pounds occasionally and less than ten pounds frequently. (Tr. 99, 111-16.)

On a Function Report completed in September 2004, Plaintiff described her daily activities as getting up, straightening up the house, working at a daycare center from noon

3

to 4:00 p.m., and coming home exhausted and in pain.  She wrote that she could not blow dry her hair due to pain, but had no other problems with self-care.  She took care of a pet, cleaned her house, did laundry, made small household repairs, and mowed the yard, a chore which would take from 11:00 a.m. until dark to complete.  She shopped for groceries, medicine, and household supplies, going to the store every three days because she could not carry very much at a time.  She wrote that she did not handle stress very well, and had a "fear of waking up and facing a new day," and that she told her doctor that she did not want to live anymore.  (Tr. 103-10.)

**Medical Record**

The record indicates that Plaintiff was diagnosed in 1992 with supraventricular tachycardia ("SVT") (abnormally fast heart rate).  Her initial medication for this was discontinued due to symptoms of depression, and she was put on Digoxin and Tiazac. (Tr. 215).  On June 14, 2002, a rheumatologist who examined Plaintiff stated that he thought she had fibromyalgia syndrome.  (Tr. 135.)

On July 16, 2003, Plaintiff's then primary care physician, Phillip Tweedy, M.D., observed trapezial (muscles of the neck, back, and shoulder) and epitrochlear (lymph node at the elbow) tender points, clear lungs, normal heart rate and rhythm, full muscle strength in all extremities, and a non-tender abdomen.  He also noted that Plaintiff appeared healthy and was pleasant, alert, and oriented, and that she was caring for three young grandchildren full-time.  An electrocardiogram ("EKG") was normal except for a poor R-wave progression.  (Tr. 255-58.)

4

On August 13, 2003, Plaintiff reported to Dr. Tweedy that she was "doing well" and that medication had improved her abdominal tenderness. Examination showed clear lungs, normal heart rate and rhythm, tenderness of the abdomen upon palpation, and tender trapezial and epitrochlear points. X-rays revealed a large duodenal diverticulum (pouch-like growth on the small intestine). (Tr. 259-60, 301.)

Due to Plaintiff's complaints of foot pain, x-rays were taken on September 9, 2003, and they showed a left hallux valgus deformity with bilateral pes planus. These were corrected surgically with a metatarsal osteotomy and screw placement, bilaterally, and x-rays taken later in September and in October 2003, showed significant improvement. (Tr. 303-04). An x-ray taken on November 18, 2003, showed a normal left ankle. (Tr. 303-08.)

Meanwhile, on September 29, 2003, Dr. Tweedy diagnosed bilateral shoulder bursitis and prescribed a nonsteroidal anti-inflammatory drug. He also increased Plaintiff's dosage of Neurontin for her fibromyalgia. Dr. Tweedy provided Plaintiff with a short-term disability placard to use for parking because she was having difficulty ambulating on her crutches (presumably due to her recent foot surgery) and because of her "fibromyalgia discomfort." (Tr. 265-66.) Diagnostic imaging of Plaintiff's abdomen on December 16, 2003, was unremarkable. (Tr. 155.)

An electrocardiogram conducted on February 27, 2004, showed normal sinus rhythm and a heart rate of 94. A full cardiac work-up was planned to determine future treatment. (Tr. 215-16.) On June 9, 2004, Plaintiff reported to Dr. Tweedy that she had

been "generally well," although she did report discomfort in her legs. Dr. Tweedy reported that Plaintiff had no difficulties in ambulation, clear lungs, normal heart rate and rhythm, and a non-tender abdomen. (Tr. 276-77.)

According to a cardiology report dated June 25, 2004, Plaintiff reported she had increased tachycardic episodes over the past few months, and that she felt tired and had low energy. Plaintiff was smoking one pack of cigarettes a day. (Tr. 220-21.) On July 9, 2004, cardiologist Richard Weachter, M.D., noted Plaintiff's 30-year history of heart palpitations and discussed possible treatment options, including ablation. It was noted that Plaintiff sat comfortably, in no distress. (Tr. 223-26.) On August 11, 2004, Dr. Weachter performed a catheter ablation to treat Plaintiff's SVT. Plaintiff recovered well from the procedure and was discharged from the hospital the next day. (Tr. 227-28.)

On August 13, 2004, Plaintiff went to the emergency room for palpitations and chest discomfort. Physical examination showed normal mood and affect, normal breath sounds, non-tender chest and abdomen, non-tender extremities with normal range of motion, and no respiratory distress. She was not admitted to the hospital. (Tr. 159-70.)

On August 23, 2004, Plaintiff told Dr. Tweedy that she felt terrible and was in pain "everywhere" and was also experiencing shortness of breath. She reported that she had to give her grandchildren, who had been living with her, back to her daughter, and that she had actually passed out lifting one of them up. Dr. Tweedy noted that Plaintiff was in no apparent distress, that she was doing fairly well with regard to her SVT, and that her blood pressure was adequately controlled with Atenolol. Plaintiff was continued on Effexor and

6

Ultracet for pain associated with her fibromyalgia, and smoking cessation was "strongly" recommended. (Tr. 281-82.)

At a follow-up visit on September 1, 2004, Dr. Tweedy reported that Plaintiff had been "generally" well since August 23, 2004. Examination showed normal heart rate and rhythm, moderately diminished breath sounds, and a non-tender abdomen. Dr. Tweedy diagnosed mild chronic obstructive pulmonary disease ("COPD") with chronic tobacco abuse. Plaintiff reported to Dr. Tweedy that she no longer had prolonged palpitations but had fleeting palpitations. (Tr. 283-86.)

Notes from a follow-up visit to the cardiology clinic on September 22, 2004, outlined the results of a 24-hour heart monitoring and physical examination that were predominantly normal. Her only complaint was some occasional nocturnal palpitations, and it was noted that she sat comfortably, in no distress. (Tr. 234-35.)

Also on September 22, 2004, John Hoerner, M.D., a rehabilitation specialist to whom Dr. Tweedy had referred Plaintiff for her fibromyalgia pain, reported that on examination Plaintiff had normal gait, no acute distress, clear lungs, normal heart rate, negative straight leg raising, full range of motion and strength in the extremities, no joint instability, and no arthritis or effusion. All of her tender points were reported as tender to palpation. Laboratory tests were scheduled, Plaintiff was directed to discontinue smoking, nortriptyline (an antidepressant) was prescribed, and a gentle exercise program of walking was recommended, with follow-up in six weeks. (Tr. 237-39.)

Examination by Dr. Tweedy on October 1, 2004, revealed regular heart rate and

rhythm, moderately diminished breath sounds, a non-tender abdomen, full muscle strength in the extremities, and diffuse tenderness to palpation in all major muscle groups. (Tr. 287-90.) When Plaintiff saw Dr. Hoerner on November 3, 2004, she told him that she and Dr. Tweedy had "fired each other." She stated that the nortriptyline was helping her "quite a bit," but that she continued to have diffuse muscle aching and intermittent left upper lumbar pain. Examination showed normal gait, negative straight leg raising, limited range of motion, and tenderness to superficial palpation in the back. Dr. Hoerner assessed "probable" fibromyalgia, although lab work screening for this condition was essentially negative. He recommended physical therapy and had a long discussion with Plaintiff about quitting smoking. Plaintiff declined an offer for a psychiatric evaluation, stating that she felt she was doing well from a mental standpoint. Follow-up was set at three months. (Tr. 240-42.)

Also on November 3, 2004, a non-examining state-agency consultant, Matthew C. Haeffner, completed a Physical RFC Assessment indicating in checkbox format that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. The form indicated that Plaintiff's ability to push and/or pull within those limitations was unlimited; that she could frequently stoop, kneel, or crouch; and that she could occasionally climb, balance, and crawl. The consultant indicated that Plaintiff had no manipulative, visual, or communicative restrictions, but that she should avoid concentrated exposure to vibrations, fumes, hazards, and extreme cold or heat. The consultant signed his name in

the box calling for the signature of a "medical consultant," but there is no indication, such as an "M.D." following his name, that he was a medical source.

In early December 2004, Plaintiff began physical therapy upon referral by Dr. Hoerner. She was discharged from therapy on January 13, 2005, after nine visits, having progressed well, although she also cancelled and/or missed several sessions. After the therapy, Plaintiff reported more flexibility and decreased lumbar spine pain. (Tr. 181-96.)

In December 2004, a social worker diagnosed adjustment disorder with mixed mood, although she observed good memory and concentration, appropriate behavior and affect, and a neat, well-groomed appearance. (Tr. 209-11.) Plaintiff attended counseling sessions for the next two months. Notes for the last session dated February 1, 2005, indicated that Plaintiff had benefitted from counseling, was handling stress well, and was no longer feeling depressed. (Tr. 212-13.)

On January 26, 2005, Dr. Weachter noted that Plaintiff was "doing well" and discharged her from care. (Tr. 243-44.) On February 8, 2005, Dr. Hoerner reported that Plaintiff said she was "doing much better," and that physical therapy had helped. He also wrote that Plaintiff told him that she had quit her job because she was raising two of her small granddaughters, whom she brought with her that day (along with a third grandchild - an infant). (Tr. 245-46.)[3] Dr. Hoerner's examination on June 24, 2005, showed normal

---

[3] The notes do not specify which job Plaintiff quit. The record before the Court indicates that Plaintiff's most recent employment before this date was as a home healthcare worker in 2003. (Tr. 83.)

gait and full strength in her arms and legs except at the shoulders; all her fibromyalgia points were tender. Range of motion in her shoulders was limited by 25 percent. It was noted that Plaintiff had been taken off nortriptyline because of cardiac issues, and that she had recently been diagnosed with sleep apnea. Plaintiff was again advised to stop smoking. (Tr. 249-50.)

On September 7, 2005, Plaintiff saw Jeffrey Wells, D.O., to establish care with him. He noted that Plaintiff brought along a granddaughter to the examination. Dr. Wells noted full strength in the upper and lower extremities, no sensory or motor defects, full grip, clear lungs, and normal heart rate and rhythm. (Tr. 198-99.) On September 26, 2005, Plaintiff was examined for diverticulitis upon referral by Dr. Wells. The examiner noted that Plaintiff was pleasant and showed no acute distress and that her abdomen was non-tender. (Tr. 293-95.)

On October 5, 2005, Dr. Wells prescribed a cane at Plaintiff's request due to knee pain; he also noted that Plaintiff was using a walker at home against his advice. Physical examination showed intact ligaments in the knees, full strength and extension in upper and lower extremities, no sensory or motor defects, clear lungs, and normal heart rate and rhythm. X-rays of both knees revealed tricompartmental changes bilaterally and that the patella was located "somewhat laterally." (Tr. 201-06.) On November 9, 2005, Dr. Wells noted normal heart rate and rhythm and clear lungs, swollen and tender knees without edema or clubbing, full strength and flexion of upper and lower extremities, full grip, and no sensory or motor defects. (Tr. 208.)

Plaintiff saw Dr. Wells on February 16, 2006, with complaints of not sleeping well secondary to pain from her fibromyalgia. She reported falling "a lot" in the morning, having not used her muscles while sleeping. She said she was tired of being in pain and was "jealous of terminally ill people because they get to die." Examination showed normal heart rate and rhythm, clear lungs, and full strength in flexion and extension of all extremities. (Tr. 335, 338.) A June 30, 2006 examination by Dr. Wells was largely the same as in February, with Dr. Wells noting that Plaintiff "moved very slowly in the clinic, like every movement she has hurts her." (Tr. 336.)

State-agency consultant Arthur Greenberg, M.D., evaluated Plaintiff on June 11, 2006, in connection with her application for disability benefits, and opined that Plaintiff had essentially no limitations, other than as necessary to accommodate seasonal allergies. His physical examination revealed normal gait, comfort both sitting and supine, normal intellectual functioning, good memory, no tender points, clear lungs, normal heart rate and rhythm, normal straight leg raising, and normal range of motion of all extremities, the neck, and the spine. Dr. Greenberg reported that Plaintiff had good coordination, could stand on one leg with no difficulty, walk on her heels and her toes, squat without difficulty, and get on and off the examining table with no significant difficulty. In an accompanying Medical Source Statement on the ability to do work-related activities (physical), Dr. Greenberg checked boxes indicating no physical limitations. (Tr. 323-33.)

On June 20, 2006, a state-agency consulting psychologist, Frank Froman, Ed.D., examined Plaintiff and reported that she was cooperative, showed adequate hygiene, and

told him that she was living with a four-year-old granddaughter. Plaintiff told Dr. Froman that she suffered from fibromyalgia, and he observed that she sat with "great discomfort" and that her "presentation was repeatedly marred by wincing in pain." Plaintiff told Dr. Froman that while working at the daycare center she had dropped a baby into her own lap and decided, "I can't do this anymore." He reported that Plaintiff's estimated IQ was in the average range. Testing for depression resulted in a score in the "severe" range, but Dr. Froman believed that this score exaggerated her depression because "numerous attributes of the test definitely overlap with physical discomfort," which Plaintiff said she experienced a great deal. Dr. Froman diagnosed "Major depression, mild severity, chronic, and a Global Access of Functioning ("GAF") score of 60.[4] He opined that Plaintiff's "major difficulties appear to be very much related to her physical status problems, which have a strong psychological overlay component to them." (Tr. 317-19.)

In an accompanying Medical Source Statement on the ability to do work-related activities (mental), Dr. Froman indicated in checkbox format that Plaintiff had no restrictions in the ability to understand, remember, and carry out detailed instructions;

---

[4] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

relate adequately to coworkers and supervisors; and respond appropriately to work pressures. (Tr. 317-22.)

On June 30, 2006, Plaintiff was seen by Dr. Wells for a recheck on her depression and fibromyalgia. Plaintiff was currently on Naprosyn, Celexa, calcium, Atenolol, Albuterol (inhaler), and Ambien. Dr. Wells assessed rebound ephalgia, allergies, depression, fibromyalgia, SVT, diverticulitis, and chronic obstructive pulmonary disease. He refilled Plaintiff's Ambien, started her on Elavil, directed her to take Midrin as needed for headaches, and directed her to return in one half year for a well-woman exam. (Tr. 336-37.)

### Evidentiary Hearing of September 26, 2006 (Tr. 41-59)

Plaintiff testified that her last employment was as a part-time daycare provider from August 26 through November 26, 2004. She quit that job because she had "dropped a baby" and didn't feel she could lift them anymore. Plaintiff testified that she was 5' 2" and weighed 160 pounds, having gained about 50 pounds since December 13, 2003, due to antidepressants she was taking. She lived in a house with her four-year old granddaughter of whom she had custody as a guardian. She testified that she was receiving temporary welfare assistance and food stamps, had a "medical card," and had completed 12th grade in regular classes.

Plaintiff testified that the biggest problems caused by her fibromyalgia were pain and falling. She indicated that she had "severe pain" in her left knee, right shoulder, right elbow, and back. She explained that since the onset of fibromyalgia, her energy level was

"a lot lower than it was before." She had seen a rheumatologist in 1998 or 2000, who ruled out rheumatoid arthritis and diagnosed fibromyalgia. Plaintiff also stated that she had trouble with concentration and memory and had to write down things she had to do.

Plaintiff also described migraine headaches, accompanied by nausea and intolerance of sounds and light, that she had experienced about once a month for the past three or four years and that lasted 24 to 48 hours. She also had diverticulosis which had flared up twice in the past 18 months and was treated with antibiotics. She testified that she experienced shortness of breath every day, sometimes brought on just by standing up, and had undergone a catheter ablation for SVT. She was using an inhaler three or four times a day for her shortness of breath. Plaintiff stated she could walk three blocks on a flat surface before she experienced shortness of breath.

Plaintiff then described back problems that made her feel that she would pass out from pain when she bent over, and that prevented her from sitting for longer than 20 to 30 minutes. She stated that she had arthritis in her knees, for which a doctor prescribed a cane about one year prior to the hearing, however, she did not use the cane because she fell both times she used it. She testified that she fell two to three times a week. Plaintiff also claimed that she had pain in both ankles, one of which required surgery and the implantation of a permanent screw. The pain in her ankles caused her to fall; elevating her feet would relieve this pain. She could walk no more than three blocks and stand in one place no more than three or four minutes without experiencing pain.

Plaintiff testified that she had not been in psychological therapy for about a year, but

14

that she currently suffered from depression.  Symptoms she described included crying spells, trouble sleeping, and not wanting "to live to see tomorrow."  However, she indicated that she was not going to kill herself.  She was taking Ambien to help her sleep, but it only allowed her to sleep two or three hours at a time.  She was also taking Atenolol, Naproxen, Elavil, Amitriptyline, Midrin, Claritin, and Albuterol.  Plaintiff drove about 35 miles every other week to see her daughter; driving any further caused stiffness.  She went grocery shopping at night because she could park closer to the store and obtain help more easily if needed.  While shopping, she would lean on the cart for support but did not use a motorized cart.

When asked about her household activities, Plaintiff responded that sweeping and vacuuming were difficult for her because such activities pulled on her shoulders and back.  It was also hard for her to bend over and pick things up.  It was easier for her to wash dishes by hand than to bend over and put them in the dishwasher; she could not, however, do a full sink of dishes at one time.  Plaintiff claimed that it was difficult to get dressed or wash her hair because it was hard for her to raise her arm over her head.  She would usually go to bed about 9:00 or 10:00 p.m. and get up between 6:00 and 7:00 a.m.  During the day, she did the exercises she learned from physical therapy, read, got her granddaughter ready for school, and cleaned her house.

Plaintiff then asked if it would be okay for her to stand up.  She explained that she rested with her feet up about an hour each day.  She testified that she did not participate in any social activities outside the house.  She could lift five to eight pounds with her left

hand, but she could not lift any weight with her right hand because of the pain it caused in her shoulder.

The ALJ asked Plaintiff about the grandchildren she cared for. Plaintiff stated that her granddaughter was four and that she had raised her since she was ten months old. In addition, she testified that her granddaughter's aunt was "getting ready to take [her] because I can't do it much longer." In addition, she previously had taken care of her grandson, who was three when she cared for him. The ALJ asked Plaintiff whether she had quit work so that she could take care of her grandchildren, and Plaintiff answered in the negative.

## ALJ's Decision of October 4, 2006 (Tr. at 14-21)

Citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), the ALJ stated that he discounted Plaintiff's subjective complaints based upon inconsistencies in the record as a whole. He summarized Plaintiff's testimony and found that she was "not credible." He noted that Plaintiff's erratic earning history did not lend "too much" credibility to her statements of work-related limitations. The ALJ found that Plaintiff's description of a limited lifestyle was not totally consistent with her statements that she prepared meals, cleaned house, did laundry, and made small repairs. He found that Plaintiff's claim that she could not work due to her impairments was inconsistent with the statement she made to Dr. Hoerner in February 2005 that she quit her job because she was raising her two small granddaughters.

After summarizing the medical record, the ALJ stated as follows:

The summary shows that examinations and testing failed to reveal signs of abnormalities that would be expected to limit the claimant as severely as she alleged.  It also shows that examiners often noted the claimant was healthy appearing, comfortable, pleasant, alert, and oriented.  The evidence as a whole fails to support the claimant's allegation.

The ALJ found Plaintiff's fibromyalgia was "a severe" impairment as that term is defined in the Commissioner's regulations in that it significantly limited her ability to perform basic work activities.  The ALJ found, however, that Plaintiff did not have severe impairments related to her heart, stomach, arthritis, lungs, or headaches.

He noted that Plaintiff was diagnosed with depression, but that examiners often found her cooperative, pleasant, alert, and oriented.  He also noted that no examiner had observed significant limitations in her daily activities, concentration, or social functioning due to depression.  The ALJ found that Plaintiff's depression did not satisfy the diagnostic criteria of Part A or B of 20 C.F.R. §§ 404.1520a.[5]  He found that Plaintiff had no

---

[5]     Under the Commissioner's regulations, an affective disorder such as depression is presumptively disabling if "A" criteria and "B" criteria are met, or if "C" criteria are met.  20 C.F.R. § 404, Pt. 404, Subpt. B, App. 1 ("Appendix 1"), Listing 12.04.  "A" criteria (medical findings) are met if there is a medically documented persistence of a depressive, manic, or  bipolar syndrome.  "B" criteria (functional limitations) are met if there is a marked functional limitation in at least two of the following four categories: (1) daily living, (2) social functioning, (3) concentration, persistence, or pace, and  (4) repeated episodes of decompensation, each of extended duration.  "C" criteria  are met if the disorder has been of at least two years duration with either (1) repeated episodes of decompensation, (2) such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or (3) one or more years of inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

limitations in activities of daily living or social functioning, and only slight limitations in concentration, persistence, or pace. The ALJ found no episodes of decompensation within one year, each lasting for at least two weeks. Thus Plaintiff's mental impairment did not meet the Part C criteria.

The ALJ then stated that Plaintiff did not have an impairment or combination of impairments that met the severity level of a deemed-disabling impairment listed in Appendix 1. Specifically, her condition did not meet Listing 1.02 (major dysfunction of a joint) because there was not consistent medical evidence over a 12-month period of gross anatomical deformity, with involvement of a major peripheral weight-bearing joint, with an inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis.

The ALJ found that Plaintiff had the RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; and sit, stand and walk for six hours (in an eight hour workday). The ALJ stated that in reaching this RFC assessment, he considered that although physicians noted that Plaintiff had signs and symptoms of fibromyalgia, such as pain and tender points, "most" noted that she had 5/5 strength and normal range of motion of her extremities. The ALJ also referred to Dr. Greenberg's June 2006 observation that Plaintiff could stand on one leg without difficulty and had no significant physical limitations.

The ALJ noted that his RFC assessment was similar to the November 3, 2004 RFC assessment of the state-agency consultant, with "some differences" in light of post November 3, 2004 evidence, in particular, Dr. Greenberg's indication that Plaintiff had no

significant limitations.  The ALJ stated that based on Plaintiff's description of her past relevant work as a store manager, department manager, and store clerk, her RFC permitted her to perform this past relevant work, and she was thus, not disabled.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted).  This "entails 'a more scrutinizing analysis'" than the substantial evidence standard.  Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)).  The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'"  Id.  (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)).  Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Both the impairment and the inability to engage in

substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix 1. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work as she actually performed it, or as generally required by employers in the national economy. If so, the claimant is not disabled. If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.

## ALJ's Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ made an improper credibility determination by focusing on her household activities and the fact that she was caring for her granddaughter. In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Polaski, 739 F.2d at 1322).

"An ALJ who rejects subjective complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ need not explicitly discuss each factor, however, and it "is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001).

Here, the ALJ pointed to valid reasons for finding that Plaintiff was not fully credible with regard to the intensity of her impairments. He noted Plaintiff's rather weak earnings prior to her alleged onset date, a factor courts consider relevant in this context. See Fredrickson v. Barnhart, 359 F.3d 972, 976-77 (8th Cir. 2004) (holding that claimant was properly discredited due, in part, to her sporadic work record, reflecting relatively low

earnings and multiple years with no reported earnings, pointing to potential lack of motivation to work).

Perhaps most notably, the ALJ pointed to Plaintiff's statement to Dr. Hoerner in February 2005 that she quit work because she was caring for two young grandchildren. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." Goff, 421 F.3d at 793. In addition, Plaintiff's ability to act as guardian and care giver for her four-year old granddaughter was a valid factor for the ALJ to rely upon in weighing Plaintiff's credibility. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that in weighing the plaintiff's credibility, the ALJ properly considered the fact that the plaintiff ceased employment at the same time she became the primary care giver to her grandchild); Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (holding that the ALJ properly found that the fact that the plaintiff was the primary caretaker of her home and two small children was inconsistent with the plaintiff's subjective allegations of disabling pain).

**ALJ's RFC Determination**

Plaintiff argues that in assessing her RFC, the ALJ did not consider all of her allegations of physical and mental limitations. A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at

1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 7, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the ALJ had before him the physical and mental assessments of Plaintiff by Drs. Greenberg and Froman, respectively, whose opinions support the ALJ's RFC findings. Both are state-agency consultants who examined Plaintiff. The opinions of such medical sources form an adequate medical basis to support an ALJ's RFC findings, especially where, as here, none of Plaintiff's treating physicians opined that she was unable to work. Moore, 572 F.3d at 523-24 (citing Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005)). Had the only evidence in the record supporting the ALJ's physical RFC assessment been the November 3, 2004 assessment of state-agency consultant Matthew C.

Haeffner, remand for clarification of this individual's qualifications would have been called for.  But  the ALJ specifically relied upon Dr. Greenberg's findings of Plaintiff's physical abilities and limitations, which support the ALJ's own findings on the matter.

The Court recognizes that fibromyalgia has the potential to be disabling, and that there are no confirming diagnostic tests for this condition.  See Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004).  Each case must be judged on its own facts, and here, the Court concludes that the ALJ's decision falls "within the available zone of choice" and should not be disturbed.  See, e.g., Heino v. Astrue, ___ F.3d ___, 2009 WL 2615293, at *5 (8th Cir. Aug. 27, 2009).

**Failure to Consult a VE**

The ALJ's decision at step four of the sequential evaluation process renders moot Plaintiff's argument that a VE's testimony was required on whether there were jobs in the economy which an individual with Plaintiff's profile could perform.  See, e.g., Banks v. Massanari,  258 F.3d 820, 827 (8th Cir. 2001) ("vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work"); Lester v. Astrue, No. No. 4:07CV01032 FRB, 2008 WL 4371492, at *14 (E.D. Mo. Sept. 19, 2008)("vocational expert testimony is not required when the plaintiff can do his past relevant work, regardless of whether non-exertional impairments exist") (citing Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996)).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of September, 2009.